# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# PANAMA CITY DIVISION

**NINA GIVEN,**

       **Plaintiff,**

**vs.**                           **Case No. 5:10cv32-RS/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Nina Given, applied for disability insurance benefits on June 14, 2005, alleging onset of disability on March 1, 2005. Doc. 11, p. 2; R. 84-85. Plaintiff's last date of insured status for disability benefits was June 30, 2009. Doc. 11, pp. 2-3. Plaintiff was 54 years of age on June 30, 2009, is a high school graduate, and has past

relevant work as a typesetter, daycare provider, secretary, convenience store clerk, and hospital admissions director. Doc. 11, p. 3; R. 715-16, 719, 92, 717. Plaintiff alleges disability primarily due to fibromyalgia, degenerative disc disease, and carpal tunnel syndrome, but also due to hepatitis, diabetes, sleep apnea, coronary artery disease, and obesity, with onset on March 1, 2005. Doc. 1, p. 2; doc. 11, pp. 2-3; R. 84.

The Administrative Law Judge determined that Plaintiff was not disabled and could perform a wide range of light work, including "the capacity to perform her past relevant work." R. 22, 26. The ALJ found Plaintiff had "the following severe impairments: degenerative disc disease of cervical/lumbar spine, diabetes, sleep apnea, fibromyalgia, hypertension, obesity, hepatitis, hypothyroidism, coronary artery disease and carpal tunnel syndrome," but concluded the impairments did not equal the listing of Appendix 1, either alone or in combination. R. 21. The ALJ determined that Plaintiff's testimony of the "intensity, persistence and limiting effect" of her pain and symptoms was "not credible" and inconsistent with the residual functional capacity assessment. R. 22. The ALJ also rejected the opinion of Plaintiff's treating physician, Dr. Denley, because it was "not supported by the objective medical evidence and diagnostic tests" and was "inconsistent with the other substantial evidence in the record." R. 25.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion." Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ.  A reviewing court must view the entire record and take account of

evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed

all evidence and has sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence

approaches an abdication of the court's 'duty to scrutinize the record as a whole to

determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662

F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

> The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):
>
> 1. Is the individual currently engaged in substantial gainful activity?
>
> 2. Does the individual have any severe impairments?
>
> 3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?
>
> 4. Does the individual have any impairments which prevent past relevant work?
>
> 5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

Plaintiff testified at the hearing that the primary impairment preventing her from continuing to work is pain in her neck that runs down her right arm, causing weakness and loss of grip on the right side. R. 723, 726. She testified that she has trouble brushing her hair or her teeth, and that she has to stop and lower her arm to rest before she can complete these tasks. R. 724. Plaintiff said that other medical problems were basically under control and that they would not prevent her from working. R. 726.

Plaintiff said that she is 5 feet two inches tall and then weighed 198 pounds. R. 716. She had lost 62 pounds in the prior year. R. 726.

Plaintiff said that her medications make her a little light headed sometimes, and drowsy. R. 727. She said she is "really drowsy every morning when I wake up." *Id.*

Plaintiff testified that she lives with her husband, who she said is "crippled" but works, as well as her sister and her sister's husband. R. 730, 732. She testified that she can sit for 30 to 45 minutes and then "usually" gets up and walks around some. R. 728. She said that she had a problem with her hip when she sits and suggested it was from fibromyalgia. *Id.* She said she could walk for about a quarter of a mile at most,[1] and had to use both hands to lift a gallon of milk. R. 729. She said she could use her hands for simple grasping and manipulation of small things, and can bend over occasionally. R. 729-730. She said that she had trouble stepping up a step due to her

---

[1] Elsewhere Plaintiff said she could not walk more than 50 feet. R. 114.

hip.  R. 730.  She said that she can reach only with the left arm, but not the right.  *Id.*

She said she had difficulties with memory and concentration.  R. 732.  She said she had

to lie down and rest "most every day."  R. 734.  Plaintiff said she usually gets out of bed

around 7:30 am and cooks with the help of her sister.  R. 730.  She is able to do the

laundry, but her sister folds it.  *Id.*  Plaintiff said that she cannot vacuum or mop the

floors.  *Id.*  She goes shopping with her sister and although Plaintiff has a driver's

license, she has not driven in over two years due to neck pain.  R. 731-32.  Plaintiff is

able to watch television and read, but said she "can't do anything else."  R. 731.  She

attends to her personal needs, but, despite the fact that she said she has no problems

with grasping and manipulation of small things, said that she is unable to fasten buttons.

R. 732, 735.

**Medical evidence**[2]

Plaintiff was examined by her treating cardiologist, Dr. Michael J. Stokes, on

December 12, 2000, for complaints of chest pain and edema of the left lower extremity.

R. 151.  An echocardiogram was unremarkable, but a nuclear study was "abnormal."

Doc. 11, p. 4; R. 150, 168.  A heart catheterization was performed on January 23, 2001,

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm.  Social Security Rulings can be found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html.  The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

and showed no signs of obstructive coronary atherosclerotic heart disease.  R. 147-148.

Plaintiff did not return again to Dr. Stokes until August, 2004, following several episodes of dizziness and nearly passing out.  R. 145.  Dr. Stokes noted that Plaintiff's "[f]unctional capacity is very limited as she does nothing in the way of exercise."  *Id.* She weighed 258 pounds.  *Id.*  It was thought that she had "significant risk factors for underlying coronary artery disease" and had "concomitant serious medical problems." *Id.*  A tilt table test was negative for neurocardiogenic hypotension, syncope, or carotid hypersensitivity.  R. 144.

She returned again to Dr. Stokes on September 20, 2006.  R. 141.  She said she had done well over the prior two years, but over the last few months had experienced chest discomfort, shortness of breath on minimal exertion, lower extremity edema on the left, dizziness, and near syncope.  R. 141.  A nuclear stress test dated October 3, 2006, revealed an ejection fraction of 69 percent with a distal anterolateral defect, but no other abnormalities.  R. 158.  Plaintiff had a coronary arteriography and left ventriculography on November 16, 2006, which revealed no significant obstruction of the left main coronary artery, 50 percent stenosis in the left anterior descending coronary artery, 40 percent stenosis in the left circumflex coronary artery, no significant obstruction in the right coronary artery, and minimal to mild hypokinesis of the anterolateral wall with an overall ejection fraction estimated at 55 percent.  Doc. 11, p. 4; R. 153.  Dr. Stokes diagnosed Plaintiff with "marked two-vessel coronary artery

disease" which would be treated with medical management and risk factor modification. R. 153.

Plaintiff was treated by Dr. Maciej Tumiel, a gastroenterologist, on April 8, 2003, for follow up of a positive biopsy showing hepatic liver cirrhosis, but without specific features of hepatitis C, autoimmune hepatitis, or primary biliary cirrhosis. R. 476. Dr. Tumiel thought that Plaintiff had either autoimmune hepatitis or primary biliary cirrhosis, and leaned toward autoimmune hepatitis. *Id.* Plaintiff was started on 6-MP[3] and by the following month, her liver function markers had stabilized or were only slightly elevated. R. 476, 454. Dr. Tumiel's opinion was that Plaintiff's cirrhosis was secondary to autoimmune hepatitis and she was continued on 6-MP. R. 454-55.

Plaintiff returned to Dr. Tumiel on June 30, 2003. R. 434. She was tired and had gained six pounds. *Id.* In addition to continuing the 6-MP, she was given a prescription for Lasix. *Id.* Plaintiff returned to Dr. Tumiel on September 2, 2004, for a follow-up on the cirrhosis and diabetes, with a new onset of left lower quadrant pain. R. 310-311. Plaintiff had fatigue. R. 310. A colonoscopy on September 9, 2004, revealed early diverticulosis. R. 305.

Plaintiff had a follow-up visit to Dr. Tumiel on March 2, 2005, for hepatitis and the various blood tests show elevated cholesterol and triglycerides which would have to be medically managed along with the hepatitis. R. 242-243. She weighed 261 pounds and

---

[3] 6-MP, 6-mercaptopurine, or mercaptopurine is a purine analogue in which sulfur replaces the oxygen atom of purine; it is used as an antineoplastic agent primarily for treatment of acute lymphoblastic leukemia. It is also used an immunosuppressant in the treatment of Crohn disease and ulcerative colitis. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

had mild edema in her lower extremities.  R. 242.  Plaintiff had additional follow-up visits to Dr. Tumiel in September and December, 2005, for bronchitis and management of hypothyroidism.  R. 239-241.  On September 6, 2005, Dr. Tumiel said she had no significant fatigue and she did not have significant back pain after Cortisone shots to the back.  R. 241.  Plaintiff had lost 14 pounds.  *Id.*

On April 7, 2006, Plaintiff had an abdominal ultrasound.  R. 224.  Her liver had moderate diffuse increase in density consistent with, but not diagnostic of, fatty replacement.  *Id.*

On March 12, 2007, Dr. Tumiel affirmed the diagnosis of "compensated" liver cirrhosis related to autoimmune hepatitis, and maintained her medication regimen.  R. 135.  She noted that Plaintiff's medical problems included insulin-dependent diabetes mellitus, hyperlipidemia, chronic back pain with neuropathy, and hypothyroidism.  *Id.* She had "finally gotten" her thyroid under control and had lost 12 pounds.  *Id.*

At her September 26, 2007, follow-up with Dr. Tumiel, Plaintiff reported no abdominal pain, shortness of breath or chest pain, had no history of jaundice, and had lost 15 pounds.  R. 631.  She weighed 222 pounds.  *Id.*  Her exam still showed mild pedal edema in the extremities, and Dr. Tumiel again diagnosed her with compensated liver cirrhosis secondary to autoimmune hepatitis and renewed her current medications. R. 631-632.

Plaintiff's last visit with Dr. Tumiel in this record was on March 24, 2008.  R. 676. She said she was "feeling fine," had lost 10 pounds, had weaned herself off of some of the pain medications, and her energy level was better.  *Id.*  She had +1 pedal edema in

her extremities.  R. 677.  An esophago gastro duodenoscopy on April 1, 2008, showed gastritis.  R. 675.

Plaintiff's first treating neurologist in this record was Dr. Karin S. Maddox.  R. 557.  She began seeing Dr. Maddox on August 9, 2004, on referral for syncopal episodes occurring about every two months.  R. 557-558.  She complained generally of chronic fatigue, difficulty seeing, heart fluttering, swelling of her feet, and recurrent joint, including pain in the neck, low back, and hip.  R. 557.  On examination, Plaintiff was alert, oriented, and her immediate recall, short term, and long term memory were normal.  R. 558.  She had normal strength in all extremities, without atrophy.  *Id.*  Her sensations on testing were intact, and tandem walking, station, and base were normal.  *Id.*  She followed up on September 13, 2004, and had not had any further episodes of near syncope.  R. 556.  She was then under the care of cardiologist, Dr. Stokes.  *Id.*  On examination by Dr. Maddox's nurse practitioner, Charnett Carroll, decreased cervical range of motion with paraspinous tenderness was found.  *Id.*  Muscle tone and strength were undiminished, however, and she was neurologically intact.  *Id.*

Plaintiff did not return to Dr. Maddox until April 26, 2007, nearly three years later.[4] R. 555.  She complained of cervical radiculopathy.  *Id.*  Dr. Maddox noted that two years earlier, Plaintiff had had an MRI of her cervical spine.  *Id.*  She also had had an NCV[5]

---

[4] She was seeing Dr. Jacob, a neurologist, in the intervening period.  *See infra.*

[5] Nerve conduction velocity testing.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

and EMG[6] study, which was positive for radiculopathy. *Id.* Plaintiff complained of progressive weakness of her right upper extremity and pain radiating down the right upper extremity. *Id.* However, Plaintiff denied having any swollen tender joints, recurrent joint pain, or pain in her neck, low back, or hip. *Id.* Spurling's sign[7] was "noted" to the right, presumably a positive finding. R. 554. Plaintiff's strength in her right upper extremity was decreased, 3 out of 5. *Id.* Another MRI, NCV, and EMG were ordered. *Id.*

The NCV report on May 7, 2007, was normal. R. 559. The EMG result revealed chronic denervation[8] potential in the lower cervical paraspinous region suggestive of radiculopathy, and clinical correlation was suggested. *Id.* By this time, Plaintiff had had a radio frequency denervation in this region. *See discussion, supra.* The MRI on May 9, 2007, showed a mild disc bulge with no other significant abnormality seen at C6-C7 and no significant abnormality at C7-T1. R. 571. The conclusion was that Plaintiff's cervical spine appeared to be intrinsically normal, with no acute process. *Id.*

---

[6] An EMG is an electromyogram. Electromyography is an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[7] Spurling's sign is a test is used for evaluation of cervical spine radiculopathy. The patient laterally bends the neck to each side while maintaining a posture of cervical extension. Pain intensified with ipsilateral bending strongly suggests a diagnosis of radiculopathy. Pain with contralateral bending suggests musculo-ligamentous origin. UNIVERSITY OF FLORIDA, COLLEGE OF MEDICINE, available at: http://www.med.ufl.edu/rheum/rheumTests.htm

[8] Denervation is an interruption of the nerve connection to an organ or part. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On May 24, 2007, Plaintiff returned to Dr. Maddox.  R. 553.  Dr. Maddox

reviewed the MRI and noted a "mild disc bulge at C6-7," and she noted that the EMG

study was positive for lower paraspinous radiculopathy.  R. 553.  Plaintiff's strength was

normal in all extremities.  *Id.*  A CT scan and an x-ray of Plaintiff's cervical spine were

ordered.  *Id.*  The CT scan of Plaintiff's cervical spine on May 29, 2007, was relatively

unremarkable.  R. 566.

Plaintiff returned to Dr. Maddox on June 26, 2007, and said that the medications

did not help "tremendously," that she felt as if she had "ants in her back area and it

radiates underneath her scapula."  R. 551.  Plaintiff's strength in all extremities,

however, remained undiminished.  *Id.*  Trigger point injections were ordered.  *Id.*

Plaintiff received 12 trigger point injections on July 11, 2007, 10 trigger point

injections on July 18, 2007, and 11 injections on July 25, 2007.  R. 548, 546, 544.

Plaintiff returned to Dr. Maddox on August 15, 2007.  R. 542.  She said that the trigger

point injections had not been helpful.  *Id.*  Plaintiff said she still had muscle pain,

weakness, fatigue, and slight inflammation.  *Id.*  She said she could not walk up stairs.

*Id.*  Dr. Maddox said that since the MRI was "okay" today, "we need to do more

investigative work into a possible disease process that may be causing this for her."  *Id.*

Her impression was chronic pain, muscle weakness, fatigue, and neck pain.  R. 543.

She decided to check Plaintiff for multiple sclerosis, Epstein Barr virus, HIV, Lupus,

scleroderma, and Sjögren's syndrome.[9]  R. 543.  Multiple sclerosis and other

demyelinating disorders were ruled out.  R. 652.

The record contains a "To Whom It May Concern" letter dated November 29,

2007, from Brent Denley, D.O.  R. 627.  This seems to be the only medical record from

Dr. Denley.  R. 626.  Dr. Denley states in this letter that Plaintiff was referred to him in

September, 2006, for "osteopathic manipulation" and to establish a primary care

provider.  R. 627.  Dr. Denley said that from Plaintiff's medical history, she had:

> multiple chronic problems including poorly controlled diabetes mellitus
> type II, hypertension, morbid obesity, fibromyalgia, peripheral neuropathy,
> chronic fatigue, autoimmune hepatitis, osteoarthritis, chronic lower
> extremity edema secondary to chronic venous insufficiency and stasis as
> well as cervical degenerative joint disease and cervical degenerative disc
> disease.

R. 627.  He said that Plaintiff "also suffers from multiple somatic dysfunctions at multiple

levels as a result of her numerous chronic problems causing resultant osteopathic

lesions or structural abnormalities." *Id.*  Dr. Denley said that these conditions had

increased in severity since 2004. *Id.*  He said that Plaintiff had had "multiple treatment

modalities," including facet joint injections and epidural steroid injections, primarily

dealing with her chronic neck and upper extremity pain, but with little improvement, and

with symptoms returning in a few days. *Id.*  He noted that physical therapy had had no

effect and had worsened her condition.  R. 627-628.  He said that he himself had

attempted to help for several months with osteopathic manipulation, but with only

---

[9] Sjögren's syndrome is a chronic inflammatory autoimmune disease that affects especially older women, that is characterized by dryness of mucous membranes especially of the eyes and mouth and by infiltration of the affected tissues by lymphocytes, and that is often associated with rheumatoid arthritis. MEDLINE PLUS (MERRIAM-WEBSTER).

marginal improvement, and he stopped that treatment. R. 628. He said that

pharmacological treatment was a serious risk due to her liver damage. *Id*. He said that

this severely limited treatment options for Plaintiff. *Id*. He said that Plaintiff was

currently taking Synthroid, Lasix, Glucotrol XL, neurontin, Zaroxoly, Ultram, and

Naproxen Sodium. *Id*. Dr. Denley said:

> Currently this patient is unable to do any kind of activity of any strength
> nature as well as unable to maintain sitting or fixed positions for extended
> periods without frequent rest movement and readjustments of posture and
> positions, thus making it impossible for her to be employed in a
> competitive job market.

*Id*. He said that Plaintiff's prognosis "is extremely poor at the present time" and he

expected that her functional capacity would "further deteriorate over time." R. 629. He

said:

> The chronicity and the extent of the involvement of this patient[']s physical
> disabilities in conjunction with her multiple chronic metabolic abnormalities
> has created the environment for multiple muscle, joint, ligament, nerve
> and functional disability that she has. This process will continue unless
> there is some radical changes and surely no change of this kind could or
> will occur within 12 months.

*Id*. He thought that Plaintiff was entitled to social security benefits. *Id*.

Plaintiff's treating endocrinologist was Dr. Amir Manzoor, who began treating

Plaintiff's diabetes on July 17, 2006. R. 170. She was referred by Dr. Tumiel for

uncontrolled diabetes type II of two years duration. *Id*. She complained of neuropathy

(which Dr. Manzoor thought might be related to her back problem), polyuria,[10]

---

[10] Polyuria is the excessive secretion of urine. MEDLINE PLUS (MERRIAM-WEBSTER).

polydipsia,[11] and polyphagia.[12]  *Id.*  She had lost 22 pounds and weighed 245 pounds.

*Id.*  Home glucose readings for Plaintiff were averaging 150 or higher.  *Id.*  Dr. Manzoor

diagnosed Plaintiff with diabetes with insulin resistance, uncontrolled, as well as

neuropathy that might be related to her back, hypothyroidism, obesity and dysmetabolic

syndrome, autoimmune hepatitis, degenerative disc and joint disease, and fibromyalgia.

R. 171.  *Id.*  Plaintiff was prescribed Lantus and Glucotrol, issued a strict diabetic diet

regimen, and advised to lose weight.  *Id.*

At Plaintiff's August 29, 2006 follow up, she reported doing only "fair," had not

lost any weight, and had some significant swelling in her lower extremity.  R. 169.  He

blood sugars had significantly improved.  *Id.*  Her medication was changed to Byetta to

help with her appetite.  *Id.*

Plaintiff's next follow up with Dr. Manzoor was on October 16, 2006, and she was

having middle back pain, had gained weight, but despite having discontinued insulin,

her blood sugars were doing "fairly well."  R. 137.  Dr. Manzoor said that control of her

diabetes seemed "significantly better," even though she had not lost weight.  *Id.*  Her

blood sugars were less than 100 "most of the time."  *Id.*  He again told Plaintiff that she

needed to lose weight.  *Id.*

On September 18, 2007, Plaintiff was referred to endocrinologist Sherief M.

Kamel, M.D., by Dr. Maddox for treatment of her diabetes.  R. 661.  She was generally

doing fine with control of her diabetes.  *Id.*  Dr. Kamel said that Plaintiff had Hashimoto's

---

[11] Polydipsia is an excessive or abnormal thirst.   MEDLINE PLUS (MERRIAM-WEBSTER).

[12] Polyphagia is excessive appetite or eating.  MEDLINE PLUS (MERRIAM-WEBSTER).

disease and autoimmune hepatitis.[13]  Plaintiff had had weight gain, but was weighing

221 pounds.  R. 662-663.  Her musculoskeletal system had myalgias and arthralgias,

but no edema, and neurologically she had numbing, but no weakness and she had

normal strength.  *Id.*

On October 30, 2007, Plaintiff returned to Dr. Kamel.  R. 659.  Plaintiff said her

sugar was too high, but she did not check it often enough and did not have a log book

with her.  *Id.*  Dr. Kamel said she had decreased memory.  *Id.*  Dr. Kamel advised that

she return to insulin, but Plaintiff declined.  R. 660.  She understood that Glucotrol

(instead of insulin) had a risk because it was metabolized through the liver, but she did

not want to use insulin again with a needle.  *Id.*  She was directed to check her blood

sugar four times a day and to keep a food diary.  *Id.*

On November 27, 2007, Dr. Kamel again saw Plaintiff.  R. 657.  Plaintiff's log

revealed that her sugars fluctuate "a lot," sometimes exceeding 300.  *Id.*  Plaintiff

reported numbness and tingling.  *Id.*  Dr. Kamel still wanted to switch Plaintiff to insulin.

*Id.*

On December 17, 2007, Plaintiff reported to Dr. Kamel that she felt "good" on

Byetta, and her sugar levels had improved.  R. 656.  The assessment still was diabetes

type II, uncontrolled.  *Id.*

Plaintiff saw neurologist, Dr. E. Jacob, on June 23, 2005.  R. 285.  She

complained of severe neck pain with symptoms radiating to the upper extremity.  *Id.*

---

[13] Hashimoto's disease, also called chronic lymphocytic thyroiditis or autoimmune thyroiditis, is a form of chronic inflammation of the thyroid gland.  MEDLINE PLUS (MERRIAM-WEBSTER).

Plaintiff was in such great pain that she was in tears. *Id.* Plaintiff said that she had

tingling, numbness, and weakness in her hands. *Id.* She also complained of low back

pain with symptoms radiating down to her lower extremities and pain in her shoulder

and hip. *Id.* It was noted that Plaintiff had seen other neurologists, Drs. Maddox and

Elzawahry. *Id.* Examination showed a cushingoid[14] appearance; upper chest area pain;

generalized edema with moderately severe pedal edema and foot edema; inability to

walk on toes, heels, or in tandem; weak handgrip; lower extremity weakness at 4/5;

decreased deep tendon reflexes in the upper extremities and absent reflexes in the

lower extremities; reduced sensation to pinprick and cold sensation in both hands and

feet; positive Tinel's[15] and Phalen's[16] signs bilaterally; and limited ranges of cervical and

---

[14] Cushingoid resembles the features, symptoms, and signs associated with Cushing syndrome. Cushing syndrome is a group of symptoms produced by an excess of free circulating cortisol from the adrenal cortex. Symptoms include fatty swellings on the back between the scapulae (buffalo hump) and around the face (moon face); distention of the abdomen; ecchymoses following even minor trauma, amenorrhea in females; high blood pressure; osteoporosis, and general weakness due to excessive protein breakdown with loss of muscle mass. There may also be hirsutism in females and streaked purple markings in the abdominal area as a result of collections of body fat. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[15] Tinel's sign is: "A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve." DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[16] "Phalen's test is used in carpal tunnel syndrome where forcible palmar flexion of the wrist causes venous engorgement of the canal and an exacerbation of the symptoms." Gpnotebook (www.gpnotebook.co.uk). "Phalen's maneuver is described as follows: the size of the carpal tunnel is reduced by holding the affected hand with the wrist fully flexed or extended for 30 to 60 seconds, or by placing a sphygmomanometer cuff on the involved arm and inflating to a point between diastolic and systolic pressure for 30 to 60 seconds." DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

lumbar motion.  R. 321.[17]  Dr. Jacob's diagnosis was severe neck pain with radicular

symptoms and signs, lumbosacral radiculopathy, end-stage renal disease, and diabetes

mellitus with painful neuropathy.  *Id.*  He ordered an MRI of the cervical and

lumbosacral spine, and an NCV and EMG study.  R. 322.  The NCV study of July 5,

2005, revealed carpal tunnel syndrome bilaterally.  R. 283.  The EMG study revealed

C5-C6 radiculopathy on the right side, L5 radiculopathy on the right side, and carpal

tunnel syndrome bilaterally.  *Id.*

At Plaintiff's follow up appointment on July 28, 2005, Dr. Jacob noted that Plaintiff

had been referred to Dr. Shores.  R. 320.  He observed that the MRI of the cervical and

lumbar spines showed mild neuroforaminal effacement at L5-S1, a mild bulging disc at

L4-L5, and mild effacement of the thecal sac at C6-7.  *Id.*  He advised Plaintiff to do

stretching and strengthening exercises for her neck and back.  *Id.*

Plaintiff began seeing Dr. Aaron J. Shores at the Pain Clinic of Northwest Florida

on July 8, 2005, for evaluation and management of her chronic pain.  R. 172-76.  Dr.

Shores had no medical records of her prior history for his review.  R. 172.  Plaintiff

reported a ten-year history of fibromyalgia, and said her symptoms (including pain and a

pins-and-needles sensation all over her body) had increased in November, 2004, for no

apparent reason.  *Id.*  Examination revealed a rounded shoulder posture with functional

cervical range of motion.  *Id.*  Spurling's maneuver was negative for neurological

symptoms of the upper extremity.  *Id.*  Plaintiff had tenderness in 16 out of the 18 points

for fibromyalgia.  *Id.*  Loading of the lower lumbar facet joints was painful but the straight

---

[17] This record of this visit to Dr. Jacob is misplaced in the record, with page 2
appearing at R. 321.

leg raising test for neurological symptoms in the lower extremity was negative. *Id.* Dr.

Shores noted from the July 6, 2005, MRI that Plaintiff had multi-level cervical

spondylosis, and neural foraminal stenosis at C3-C4 on the left, at C5-C6 bilaterally,

and C6-C7. R. 175. His diagnosis, however, did not include cervical problems, but

noted fibromyalgia, paresthesias involving the bilateral thumb and right medical hand,

and autoimmune hepatitis and cirrhosis. *Id.* Dr. Shores said he spent over an hour with

Plaintiff and explained to her that she would probably never be completely pain free. *Id.*

His goal was to control her pain and increase her activities of daily living. *Id.* He said

that Plaintiff's neck hurt the most, and he would focus treatment there. *Id.* Dr. Shores

was reluctant to add more narcotics or other medications, and he advised Plaintiff that

she needed to establish a primary care physician. *Id.* He told Plaintiff that the only

proven treatments for fibromyalgia were sleep, decrease of stress, and aerobic activity.

*Id.* Dr. Shores discontinued Skelaxin, changed the dose of Neurontin, and started

Plaintiff on a series of epidural steroid injections and nerve blocks. R. 176.

Between August 2, 2005, and September 1, 2005, Dr. Shores administered

epidural steroid injections and nerve blocks to Plaintiff's cervical and lumbar spine. R.

218-223. On September 12, 2005, Plaintiff reported 80 percent improvement since her

last injection. R. 198. She was given three more trigger point injections that day. *Id.*

On December 12, 2005, Plaintiff had pain in the left groin without radiation. R.

196. She also had mild back pain. *Id.* Another trigger point injection was administered.

*Id.* Doc. 11, p. 8; R. 196. Dr. Shores thought that her groin pain was largely myofascial.

R. 197.

On December 19, 2005, Plaintiff returned to Dr. Shores.  R. 194.  Her pain did not feel improved.  *Id.*  Plaintiff described low back pain radiating down the right lower extremity to the kneed.  *Id.*  Bilateral knee injections were provided.  R. 195.  He scheduled Plaintiff for right L3-L4 through L5-S1 facet joint diagnostic medial branch blocks.  *Id.*  The right branch blocks were performed on December 29, 2005.  R. 216.

On January 3, 2006, Plaintiff reported only a 15% improvement with the medial branch blocks.  R. 192.  She complained of low back pain, worse on the left than the right, and worse with prolonged sitting and standing.  *Id.*  He thought that branch blocks on the left would be useful, to be followed perhaps with radio frequency denervation, if her pain improved.  R. 193.  The left branch blocks were performed on January 5, 2006.  T. 214.

On January 11, 2006, Plaintiff saw no long term benefit from the left side facet joint diagnostic blocks.  R. 191.  She was given bilateral knee injections.  *Id.*  Her knees were injected again on January 19, 2006, January 25, 2006, February 2, 2006, and February 13, 2006.  R. 186-190.  She also had a T1-T2 interlaminar epidural steroid injection and a bilateral thoracic paravertebral never blocks x 4 on February 2, 2006.  R. 212.  She said that these made a substantial improvement for her pain.  R. 186-189.  By February 27, 2006, she said that her knee pain had improved 85%.  R. 185.

Facet Joint diagnostic medical branch blocks on the right C3-C6 were performed on June 15, 2006, by Dr. Shores.  R. 210.  This was repeated with right confirmatory blocks on June 22, 2006.  R. 208.

By June 28, 2006, Plaintiff reported that her pain had begun to return. R. 179.

Dr. Shores told Plaintiff that she was a good candidate at that point for radio frequency

denervation with the expectation of pain relief for 6 to 12 months thereafter. *Id.* He

scheduled the denervation procedure for right C3 through C6. R. 180. On July 20,

2006, Dr. Shores performed a radio frequency denervation of the facet joints at these

three levels of Plaintiff's cervical spine. R. 206-207.

On August 3, 2006, Plaintiff reported only a 20 percent improvement in her neck

pain. R. 177. Plaintiff said she was having pain in her neck and shoulders. *Id.*

Spurling's test was negative for any neurologic symptoms in Plaintiff's upper extremity.

*Id.* Dr. Shores said that "loading" of the cervical facet joints was improved, and there

were no active trigger points or tender points along the cervical or lumbar paraspinal

muscles. *Id.* Dr. Shores thought that Plaintiff's "exam looks remarkably improved"

today. *Id.* He noted: "I still suspect that there is a great deal of psychosocial overlay

confounding her symptomatology and I think she would benefit from evaluation by a

psychologist, but she declines." *Id.* Dr. Shores ordered another cervical MRI. R. 178.

A follow up MRI of the cervical spine dated August 9, 2006 revealed that the

cervical spine was in "normal alignment" with normal height and contour of the vertebral

bodies, well maintained intervertebral disk spaces, and a normal spinal cord. R. 202.

At the C6-C7 level there was a broad disc osteophyte complex causing mild canal

stenosis and minimal indentation of the ventral cord. *Id.* No other neural foraminal

narrowing or extradural defects were identified. *Id.*

Plaintiff examined by Dr. Owen D. Oksanen, on February 20, 2006, on a consultative basis. R. 276. Plaintiff told Dr. Oksanen that she could not work primarily due to neck and wrist pain, but also due to chronic fatigue. *Id*. Plaintiff drove to the examination. *Id*. Dr. Oksanen reported that Plaintiff's husband was working full time and was not, as stated in her paperwork, disabled. *Id*. Plaintiff told Dr. Oksanen that she cares for herself at home, does most of the cooking, cleaning, and shopping, but has help from a cleaning person. *Id*.

Dr. Oksanen had no clinical paperwork to support the diagnosis of hepatitis or cirrhosis. *Id*. While Plaintiff was described as edematous, he saw "simple obesity." *Id*. He saw a reference to advanced cirrhosis, but saw no supportive data. *Id*. He felt that the current examination did not support a finding of lumbar radiculopathy. *Id*. He said that chronic pain was described, that Plaintiff was "aching all over, all the time," and felt it was a "subjective version of fibromyalgia," and that obesity and poor conditioning may also be playing a role. *Id*. In a section entitled "work capability," Dr. Oksanen wrote:

> This patient was able to sit for a prolonged period of time in the office without apparent difficulty. Spontaneous movement was slowed somewhat by her girth, but she was fully ambulatory and able to get up onto the exam table. When asked, she bent over at least 70° to touch her toes, without difficulty. She was able to take her shoes and socks from a standing position, twisting both her low back and neck substantially, without obvious pain. She can sit up on the exam table with her feet outstretched 90° at the hip. . . .

R. 277.

On physical examination, Dr. Oksanen found no edema, though there was some synovial thickening in the knees. R. 278-279. Plaintiff had full range of motion throughout, and her strength was "5/5," that is, undiminished. R. 279. The back

examination revealed no obvious paravertebral muscle spasm, palpable pain, or deformity.  *Id.*  Straight leg raising exceeded 80° with all distracted tests, but formal straight leg raising was positive bilaterally at about 20-30 degrees.  *Id.*  Plaintiff's grip and fine motor function were intact.  *Id.*

Dr. Oksanen's conclusion that Plaintiff was poorly conditioned and massively obese.  R. 279.  He thought that her body habitus predisposes her to the metabolic problems listed.  *Id.*  He said: "Diet and exercise compliance are not good here."  *Id.*  He saw no significant sequelae of any liver disease, to include ascites, skin changes, pruritus, or jaundice.  *Id.*  He thought that Plaintiff had reasonable neck range of motion without any apparent sequelae.  *Id.*  He could not comment on the condition of Plaintiff's lumbar spine "because of the inappropriate responses seen."  *Id.*  He commented that Plaintiff did not stop working for medical reasons, and he thought that the "psychosocial aspects of this request for disability needs to be evaluated."  *Id.*

On September 7, 2005, Dr. Nguyen, a non-examining physician with the State agency assessed Plaintiff's residual physical function on the basis of his review of unspecified medical records.  R. 324-331.  Dr. Nguyen found Plaintiff capable of the exertional demands of the full range of sedentary work.  *Id.*  Another physician with the State agency concluded on February 23, 2006, that Plaintiff could perform the exertional demands of medium work, save for occasional postural limitations.  R. 268-275.

Dr. Richard Jackson was called by the Commissioner as a medical expert.  R. 691.  Dr. Jackson is a board certified in internal medicine.  R. 694.  Dr. Jackson reviewed all of the medical evidence.  *Id.*

Dr. Jackson said Plaintiff's coronary artery disease was moderate but not limiting. R. 696. He noted that her diabetes mellitus was moderately severe, and not under as good control as it should be. *Id.* He found her obesity to be severe. R. 697. Dr. Jackson said that Plaintiff's liver enzyme tests were fairly normal, but said that her problem with cirrhosis would not go away with treatment. *Id.* He noted that Plaintiff has "consistently" met the clinical diagnostic criteria of fibromyalgia, that is, sleep disturbance and multiple trigger points that are tender. R. 698. Dr. Jackson noted that both hepatitis and fibromyalgia could cause fatigue. *Id.* He deemed Plaintiff's hypertension, peripheral neuropathy, carpal tunnel syndrome, controlled hypothyroidism, and sleep apnea to be mild. R. 696-698. Dr. Jackson noted Plaintiff's blood tests indicating measures of her cholesterol, thyroid function, and blood sugars had varied. R. 703.

He said her degenerative cervical arthritis was moderate. R. 699. He thought that the radio frequency denervation had been somewhat successful in that he saw no evidence since the denervation of a particular radiculopathy in the cervical region, noting that the complaints in recent years had been more of generalized pain. R. 699-701. He also noted that even though Plaintiff had undergone nerve blocks and epidural steroid injections, her pain had become "more global . . . than it was then." R. 703. Dr. Jackson saw no evidence of radiculopathy on examination by other physicians, and stated that the EMG report, which indicated possible cervical radiculopathy, would be better explained as reflecting a "dead" nerve from the radio frequency ablation she had received, as radiculopathy is not correlated by any objective findings. R. 701, 706.

Dr. Jackson concluded that none of Plaintiff's conditions would either meet or equal the criteria of any Listing. R. 708. He thought that Plaintiff could occasionally lift and carry ten pounds, frequently lift and carry five pounds, stand or walk six hours, could sit without limitation, frequently climb ramps and stairs, occasionally perform postural activities, and might have occasional fine manipulation of objects due to the "potential" for limitations due to her carpal tunnel syndrome. R. 708-711. He then qualified his opinion and said that discounting subjective complaints, and relying solely on objective medical evidence, Plaintiff should be able to lift and carry 20 pounds and frequently lift and carry 10 pounds. R. 712-713.

The vocational expert classified Plaintiff's past relevant work as admitting officer as a skilled, sedentary job as reflected under code 205.162-010 of the *Dictionary of Occupational Titles* ("*DOT*"); daycare worker, as a light, semi-skilled job under *DOT* code 359.677-018; retail sales clerk, as a light, semi-skilled job under *DOT* code 290.477-014; secretary, a sedentary, skilled job under *DOT* code 201.362-030; and typesetting, a light, skilled job under code 650.582-018. R. 737-738. Mr. Bradley stated that someone of Plaintiff's age, education, and work history, who can stand or walk up to six hours and sit up to six hours in an eight-hour workday, and occasionally climb, balance, kneel, crouch, crawl, or stoop, could perform all of her past relevant work except the retail sales clerk job as actually performed, which was at the medium level of exertion. R. 738. Someone with the same limitations, who could sit for up to six hours, but who could stand no more than two to four hours, could perform the jobs of admitting officer, secretary, and typesetter. R. 739. He said that someone likely to miss three or

four workdays a month and who must also lie down for an hour during the workday in addition to usual breaks would not be able to perform any jobs.  R. 739.

**Legal Analysis**

### Whether the ALJ erred in failing to give substantial weight to the opinion of Plaintiff's treating physician, Dr. Denley

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless "good cause" is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).  "Where the Secretary has ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true."  *Id.*; Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD).  *Compare*, Harris v. Astrue, 546 F.Supp.2d 1267 (N.D. Fla. 2008) (No. 5:07cv44-RS/EMT) (remanding because the ALJ gave improper reasons to discount the opinion of a treating physician, but did not ignore it).[18]  *But see,* Cole v. Barnhart, 436 F.Supp.2d

_____

[18] Harris distinguished MacGregor as a case where the ALJ made no finding as to the weight of the opinion of the ALJ, *i.e.*, he *ignored* the opinion.  786 F.Supp.2d at 1282.

1239 (N.D. Ala. 2006) (finding that the opinions of the treating physician must be accepted as true where the ALJ "did not properly refute them.").

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory."). *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

A consultative examination, that is, a one-time examination by a physician who is not a treating physician (like Dr. Oksanen), need not be given deference by the Commissioner. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (a consulting physician's opinion "deserves no special weight"). The opinion of a consultative physician, however, is still a medical opinion deserving of consideration along with all of the other evidence. If the opinion of a consulting physician is consistent with other medical evidence, it is entitled to great weight. Moncrief v. Astrue, 300 Fed.Appx. 879, 881 (11th Cir. Dec 1, 2008) (not selected for publication in the Federal Reporter, No. 08-12853) (citing 20 C.F.R. § 404.1527(f)(2)(i)). The opinion of a non-examining physician (like Dr. Jackson) is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good

cause for disregarding the opinion of the treating physician. <u>Broughton v. Heckler</u>, 776 F.2d 960, 962 (11th Cir. 1985). Standing alone, the opinion of a non-examining physician "does not constitute substantial evidence to support an administrative decision." <u>Swindle v. Sullivan</u>, 914 F.2d 222, 226 n.3 (11th Cir. 1990), *citing*, <u>Broughton v. Heckler</u>, 776 F.2d 960, 962 (11th Cir. 1985); <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 280 (11th Cir. 1987).

The ALJ rejected the opinion of treating physician, Dr. Denley, who determined that Plaintiff was unable to "be employed in a competitive job market." The ALJ concluded that Dr. Denley's opinion was unsupported "by the objective medical evidence in the record and diagnostic tests previously noted" and was "inconsistent with other substantial evidence in the record." R. 25.

This reasoning was prefaced by a review of the medical evidence. R. 23-24. There was no discussion of treatment records from Dr. Denley because there his treatment records are not in the record. In this regard, therefore, the determination that Dr. Denley's opinion was not supported by objective medical evidence is supported by substantial evidence in the record.

Plaintiff argues that the ALJ overlooked or ignored supporting evidence from Dr. Shores that bolstered Dr. Denley's opinion. Plaintiff notes that the ALJ determined that Plaintiff's claims of disability in her neck, low back, and extremities were not supported by findings from Dr. Shores, relying upon the findings of Dr. Shores that Plaintiff had functional cervical range of motion, and Spurling's maneuver and the straight leg raising test were negative for pain. Doc. 11, p. 14, citing R. 23. Plaintiff argues that Dr. Shores

also found that Plaintiff had rounded shoulder posture, tenderness over the occipital grooves, 16 out of 18 characteristic points for fibromyalgia, a circular lesion on her right foot, decreased ankle reflexes, decreased sensation to touch over the thumbs, fifth digit, and the back of the hand to the wrist of the right hand, and decreased sensation to vibration over both lower extremities. Doc. 11, p. 14. It is argued that Dr. Shores's examination "yielded findings sufficient for [the ALJ] to diagnose fibromyalgia; paresthesias in the thumbs and right hand; autoimmune hepatitis and cirrhosis; peripheral neuropathy; and evidence of cervical and lumbar facet syndrome." *Id.*

Plaintiff notes that Dr. Shores did not think Plaintiff would ever be completely pain free, and his treatment goal was to increase the quality of her daily activities. *Id.* Plaintiff argues that the evidence does not support a conclusion that Plaintiff experienced a substantial improvement in pain levels. *Id.* Plaintiff notes that between December, 2005, and June, 2006, her pain returned and she had to resume cervical and lumbar injections (medial branch blocks), and when her pain resumed again, she had to have a radio frequency denervation at three cervical levels. *Id.*, pp. 14-15. After that, argues Plaintiff, she reported only a 20% improvement in pain level. *Id.*, p. 15. Plaintiff argues that this evidence does not support the ALJ's conclusion that Plaintiff attained a 70-100% improvement in her neck and back pain. *Id.* Plaintiff argues that the ALJ overlooked this evidence, culling only the evidence from the treatment notes of Dr. Shores that supported his decision to reject the opinion of Dr. Denley. *Id.*

Plaintiff's argument has the support of some of the substantial evidence in the record, which has been discussed above. But there was also contrary substantial

evidence relied upon by the ALJ. On August 3, 2006, after the series of medial branch blocks and radio frequency denervation in the first half of 2006, Dr. Shores again examined Plaintiff. R. 177. Spurling's test was negative for any neurologic symptoms in Plaintiff's upper extremity. *Id.* This is an important objective medical finding with respect to Plaintiff's experience of pain in her cervical spine. Dr. Shores also said that "loading" of the cervical facet joints was improved, and there were no active trigger points or tender points along the cervical or lumbar paraspinal muscles. *Id.* This, too, was an important objective medical finding. Dr. Shores thought that Plaintiff's "exam looks remarkably improved" that day. *Id.* He noted: "I still suspect that there is a great deal of psychosocial overlay confounding her symptomatology and I think she would benefit from evaluation by a psychologist, but she declines." *Id.* Dr. Shores ordered another cervical MRI. R. 178. The MRI of the cervical spine dated August 9, 2006 revealed that Plaintiff's cervical spine was in "normal alignment" with normal height and contour of the vertebral bodies, well maintained intervertebral disk spaces, and a normal spinal cord. R. 202. At the C6-C7 level there was a broad disc osteophyte complex causing mild canal stenosis and minimal indentation of the ventral cord. *Id.* No other neural foraminal narrowing or extradural defects were identified. *Id.* These mild objective medical findings further support the opinion of Dr. Shores that Plaintiff was "remarkably improved." Plaintiff may have claimed only a 20% improvement in pain following the radio frequency denervation, but Dr. Shores's objective examination and

the results from the MRI do not support that subjective assertion, or at least, the ALJ was justified in so concluding.[19]

The ALJ also noted that Plaintiff's diagnosis of fibromyalgia was supported by the finding of 16 out of 18 tender trigger points, but reasoned that the subsequent treatment notes of Dr. Shores "indicate some improvement in her symptoms with injection therapy." R. 23. I am aware that it would be a misunderstanding of the nature of fibromyalgia to require " 'objective' evidence for a disease that eludes such measurement." Green-Younger v. Barnhart, 335 F.3d 99, 108 (2nd Cir. 2003); Lee v. BellSouth Telecommunications, Inc., 2009 WL 596006, *8 (11th Cir. Mar 10, 2009) (not selected for publication in the Federal Reporter, No. 07-14901). Fibromyalgia, however, manifests itself in a full spectrum of symptoms, from the least disabling to the most, and critical to the ALJ's analysis is a judgment as to the extent of disability based upon findings of treating physicians which, in turn, must be based largely upon subjective reports and contact with the patient. It is appropriate for the ALJ to make judgment calls about the credibility of the claimant and the extent of the disability from fibromyalgia based upon all of the evidence in the record. Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005). Further, it is observed that at the hearing, Plaintiff did not testify that she is disabled due to the debilitating effects of fibromyalgia. She said that her primary impairment preventing her from continuing to work is pain in her neck that runs down

---

[19] It is also noted that an NCV study on May 7, 2007, was normal for Plaintiff's upper extremities, and the EMG showed "chronic denervation potential in the lower cervical paraspinous regions suggestive of radiculopathy," but suggesting clinical correlation. R. 559. As discussed earlier, Dr. Jackson felt that this finding on the EMG was consistent with the fact that Plaintiff had had radio frequency denervation in that region. R. 701, 706.

her right arm, causing weakness and loss of grip on the right side.  R. 723, 726.  She

testified that other medical problems were basically under control and that would not

prevent her from working.  R. 726.

Like Dr. Denley, Dr. Shores was a treating physician.  In summary, while there is

some contrary evidence from Dr. Shores, the most recent objective evidence from Dr.

Shores is substantial evidence to discount the opinion of Dr. Denley, based as it was

upon the condition of Plaintiff's spine and her fibromyalgia.  The court's role is not to rule

on this issue *de novo*, but to affirm if the ALJ's opinion is supported by substantial

evidence.

Plaintiff argues that the ALJ determined that the findings of consultative family

practitioner, Dr. Oksanen, also undermined Plaintiff's assertions and Dr. Denley's

opinion.  Doc. 11, p. 15.  Plaintiff argues that Dr. Oksanen's conclusion that Plaintiff did

not display abnormalities consistent with carpal tunnel syndrome and other neurological

abnormalities, and found Plaintiff had a "basically normal" examination all around,

contradicts the medical evidence from the earlier EMG, NCV report, the MRI evidence

of cervical and lumbar radiculopathy, and the findings from Dr. Jacob's neurological

examinations.  Doc. 11, p. 15.[20]  Plaintiff argues that the medical evidence from treating

physician Dr. Jacob, a neurologist, and Dr. Shores, a pain management specialist, is

_____

[20]  Dr. Oksanen's notes stated that "supportive clinical paperwork" was not available
to review with the exception of a note from Plaintiff's neurologist.  Doc. 9-1, p. 119.  He
also noted that there was a "reference to advanced cirrhosis, but" without supportive
data.  *Id.*  Dr. Oksanen explained that the "extent of cirrhosis found would certainly be
significant" as would be the "type of hepatitis she has," but that "information still has to
be obtained, however."  *Id.*

more probative as to whether Plaintiff has carpal tunnel syndrome or other neurological abnormalities. *Id.*, at 15.

The ALJ noted that:

Electrodiagnostic studies in July 2005 showed bilateral carpal tunnel syndrome . . . and [Plaintiff] was given a splint and exercise program by Dr. Jacob . . . . Although she was consultatively examined in February 2006 by Dr. Oksanen, she exhibited no abnormalities consistent with carpal tunnel syndrom in either wrists . . . .

R. 24. The ALJ further noted that Dr. Jackson said that the results of the examination by Dr. Oksanen were "basically normal." *Id.* Thus, the ALJ properly accounted for the evidence with respect to Plaintiff's carpal tunnel syndrome. His implicit conclusion, that by the time Dr. Oksanen examined her, that condition had improved, is supported by substantial evidence in the record, Dr. Oksanen's consultative examination. This is also supported by the September 6, 2007, examination by Dr. Maddox, finding that Plaintiff's sensory perceptions were intact, her finger to nose coordination was normal, and she had normal strength in all extremities, a finding which included the functioning in her arms and hands. R. 653.

Plaintiff also argues that the ALJ's four other reasons for disregarding Plaintiff's testimony of pain and Dr. Denley's opinion were irrelevant to the issue of functional limitations. Doc. 11, pp. 15-16. Those reasons (greater control over blood sugars and diabetes, loss of weight, stabilization of liver condition, and that her coronary artery disease did not warrant surgery) are argued to be "not very relevant to the issue of the functional limitations that are nonetheless imposed by her more functionally limiting impairments consisting of fibromyalgia, cervical and lumbar disease, and carpal tunnel

syndrome." Doc. 11, p. 16. Plaintiff argues that control of diabetes, obesity, and liver disease will certainly benefit her overall functioning, but that these are separate from the issues of "how long she can sit without changing position or needing to take a break due to the physical pain imposed by her neck and low back conditions, the all-over pain and fatigue of her fibromyalgia, and the manipulative and grasping difficulties imposed by her carpal tunnel syndrome." *Id.*

The argument is not persuasive. Plaintiff's overall health was properly considered to determine whether any of those conditions could render Plaintiff disabled. It would have been error not to consider the extent of the disabling effects of all conditions.

Finally, the ALJ rejected the opinion of Dr. Denley, relying upon the expert summation of the evidence by Dr. Jackson. R. 24. While Dr. Jackson's opinion as a non-examining physician is not enough, standing alone, it is substantial evidence to consider along with the other evidence. Dr. Jackson provided a physician's perspective with respect to the medical evidence. In summary, the ALJ's reasons for failing to give substantial weight to the opinion of Dr. Denley are supported by substantial evidence in the record. The ALJ's conclusion as to the weight to be given Dr. Denley's opinion was not error.

**Whether the ALJ erred in discounting Plaintiff's testimony**

The ALJ found that Plaintiff had "medically determinable impairments [that] could reasonably be expected to produce some of the alleged symptoms," but he found her "statements concerning the intensity, persistence and limiting effects of these symptoms" to not be "credible to the extent that are inconsistent with the residual functional capacity assessment for the reasons explained below." R. 22. He then discussed the evidence, much of which has been set forth above.

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Pain and other symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated by the ALJ for disregarding the claimant's subjective testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991). It is not necessary that the ALJ expressly identify this

circuit's standard if his findings "leave no doubt as to the appropriate result" under the law.  Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

Plaintiff testified that she could only sit for 30-45 minutes before needing to get up and move around, that her hip prevents her from sitting longer, and that she cannot stand or walk more than one hour.  She said that she can only lift a gallon of milk by using two hands, that she has trouble climbing just one step in her living room, and that she can only reach with her left arm and not her right.  She said that she has problems with memory and concentration, must lie down every day after lunch for an hour due to pain, and although she said she did not have trouble manipulating or grasping small things, said she cannot perform fine handling skills such as fastening buttons.   Plaintiff argues her limitations are rooted in the diagnosis of fibromyalgia.  She argues that the examination by Dr. Shores where Plaintiff had 16 of 18 tender points supports the diagnosis.

Plaintiff argues that one of the ALJ's reasons for disbelieving her pain testimony, that no doctor had indicated that there was a medical reason that her daily activities should be so limited, is false.  Doc. 11, p. 18.  Plaintiff points to Dr. Denley's letter in support of her social security disability benefits.  The ALJ, however, gave sufficient reasons for discounting the opinion of Dr. Denley.

Plaintiff argues that the MRI, read by neurologist Dr. Jacob, provides support for her carpal tunnel syndrome, and cervical and lumbar disease with radicular features.  Doc. 11, p. 17, *citing* R. 320, 321, 283.  It is true that Dr. Jacob's July 28, 2005, report stated Plaintiff had carpal tunnel syndrome, and the MRI showed "mild neuroforaminal

effacement," "mild bulging disc," degenerative changes in Plaintiff's spine. R. 320. Yet

Plaintiff was given an exercise program for her carpal tunnel syndrome, neck and back

stretching exercises, and was directed to follow up with Dr. Shores. *Id.* As noted by the

ALJ, the more recent images of her spine (performed May, 2007) were essentially

normal. R. 571. The NCV study dated May 7, 2007, revealed a "normal NCV of the

upper extremities." R. 562.

Plaintiff further points to the statement made by Dr. Shores that Plaintiff would

never be "completely pain free." R. 175. One can work and not be completely pain

free. The issue is the severity of the pain. The ALJ's conclusion that Plaintiff had

significant improvement is supported by substantial evidence discussed above.

Defendant has argued that the medical evidence presented shows only "mild

degenerative changes", a lack of neurological abnormalities, and that Plaintiff had "good

range of motion, no muscle pain or weakness, good grip and fine motor function, normal

gait, and 5/5 strength throughout, [and] no abnormalities consistent with carpal tunnel

syndrome in either wrist when examined by Dr. Oksanen in February, 2006 . . . ." Doc.

15, p. 5. The ALJ also noted that Dr. Tumiel's examination in August and September,

2007, revealed "normal muscle bulk and tone, normal strength in all extremities, normal

mental status, normal reflexes and coordination, intact gait, and intact sensation, and a

normal nerve conduction study of the upper extremities." *Id.*, at 6. These later findings

show improvement in Plaintiff's condition. The ALJ did not err in finding Plaintiff's

statements of her pain level as being not wholly credible.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and correctly followed the law. The decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on October 29, 2010.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.